# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| TWRONDA MOORE for her minor child, T.P., | ) ) ) | |
| Plaintiff, | ) ) | No. 12 C 9942 |
| v. | ) ) | Magistrate Judge Cole |
| CAROLYN W. COLVIN,[1] Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Twronda Moore seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her daughter T.P.'s application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 1382c(a)(3)(A). Ms. Moore asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

Ms. Moore applied for SSI on behalf of T.P. on July 1, 2009, alleging that she had become disabled on August 1, 2007. (Administrative Record ("R.") 198). Her application was denied initially and upon reconsideration. (R. 130-138, 143-147). Ms. Moore continued pursuit of her claim by filing a timely request for a hearing.

An administrative law judge ("ALJ") convened a hearing on January 4, 2011, at which Ms.

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

Moore and her daughter, represented by counsel, appeared and testified. In addition, Milton Schwartz appeared and testified as a vocational expert. (R. 48-129). On July 29, 2012, the ALJ issued a decision finding that T.J. was not disabled because she had no limitation in acquiring and using information, less than a marked limitation in attending and completing tasks, less than a marked limitation in interacting with others, no limitation in moving about and manipulating objects, a marked limitation in caring for herself, and less than a marked limitation in health and physical well-being. (R. 19-43). The ALJ's decision then became the final decision of the Commissioner when the Appeals Council denied Ms. Moore's request for review of on October 19, 2012. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Moore has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## THE EVIDENCE OF RECORD

### A.

### Medical and School Reports

T.P. was six years old at the time of the ALJ's decision, but she had already exhibited a record of behavior that ranged from disruptive to violent and dangerous. In 2008, when she was three, she attended the Catholic Charities Diocese of Joliet preschool. In just eight months, school records reflect that T.P. was disruptive in class (*see, e.g.,* R. 259, 266, 270, 271-4, 281, 313), oppositional with her teachers (*see, e.g.,* R. 262-3, 270, 281, 310, 435, 440), and physically and verbally aggressive with her peers and teachers (*see, e.g.,* R259, 262-3, 264-5, 266, 271-4, 277-80, 281, 301-7, 308, 311-2). During this time, T.P. also would put small items in her mouth, climb on

2

furniture and jump off, play in the toilet, eat soap and playdough, and run out of the classroom. (R. 262-3, 266, 275-6, 277, 277-80, 440). Her teachers reported that she required one-on-one attention throughout the day for her safety and the safety of others, and that she was "hyper" and compulsive throughout the day, refusing to participate in group activities and requiring removal from the class for safety reasons as well as her various forms of disruptive behavior. (R. 258, 256-7).

On March 5, 2008, Brigance testing indicated that T.P. could only play or watch television for one to five minutes before losing interest, did not play with other children for very long or very well, did not have a best friend, did not seem to know what is good behavior and what is not in regard to herself, did not seem concerned when a playmate is hurt or try to avoid hurting a playmate, did not deal with losing games well and, overall, caused concern in both her behavior and getting along with others. (R. 433). On April 3, 2008, a classroom observer attended T.P.'s classroom, and noted her to have psychomotor agitation, inattention, hyperactivity, and impulsivity that met the diagnostic criteria for both attention-deficit/hyperactivity disorder ("ADHD") and oppositional defiant disorder ("ODD")[1] (R435-6). On July 8, 2008, another observer reported that T.P. displayed extreme difficulty with class participation requiring one-on-one supervision and ongoing restraint to ensure everyone's safety, as she was spitting, kicking, and screaming (R440-41).

On April 21, 2009, T.P. underwent an initial mental health assessment with Will County Health Department. (R. 340-54). She was described as angry, hostile, and irritable (R. 342), and was noted to have frequent oppositional behaviors, impulsivity, hyperactivity, some depression and anxiety and anger issues, and it was very difficult for her to pay attention. (R. 346, 351-54). She was cruel to the family's pet dog, hitting it or pulling its tail. (R. 352). She acted aggressively toward teachers. (R. 353). T.P. was initially diagnosed with an adjustment disorder and individual therapy

3

was started in May 2009. (R. 353, 354, 363).

Dr. Troupe performed a mental status examination at that time and diagnosed ADHD and a conduct disorder. He started T.P. on 5mg of Adderall. (R. 363-64). T.P. continued to see Dr. Troupe about twice a month. On June 23, 2009, it was noted that the beneficial effects of her medication only lasted about three hours (R. 355-62, 401-12), and so the Adderall was increased. (R. 405-06). T.P. was stable for a month or two. (R. 359-60). But, in September 2009, she was "still overactive" and the school recommended that her medication be adjusted because once again, it was not working. (R. 358, 405). T.P. appeared to stabilize with her new medication regimen through January 2010. (R. 401-03).

In September 2009, T.P. underwent a psychological consultative examination ("CE") that the Social Security Administration arranged. Glen Wurglitz, Psy.D., diagnosed ADHD and ODD. (R. 383-86). Dr. Wurglitz noted that T.P. was unable to sustain focused concentration throughout the mental status examination, getting up from her seat and trying to touch his head, rocking in her chair, and talking incessantly. (R. 385). She required constant redirection, was unable to repeat more than three digits forward, and was completely unable to do them backwards, getting off task asking Dr. Wurglitz all sorts of questions about his office. (R. 385-86).

On September 22, 2009, a non-examining State agency reviewing psychologist, Thomas Low, Ph.D., completed a Childhood Disability Evaluation Form ("CDEF"). He felt that T.P. had less than marked limitations in attending and completing tasks and interacting and relating with others; she had no limitations at all in acquiring and using information, moving about and manipulating objects, or caring for herself. (R. 387-92). On January 22, 2010, another non-examining reviewer, Terry Travis, M.D., completed another CDEF, and found that T.P.'s only area

4

of difficulty was a less than marked limitation in attending and completing tasks. (R. 393-98).

From March 26, 2010, through June 16, 2010, T.P. saw Dr. Troupe for her psychiatric therapy sessions two times and a therapist six times (R423-31). On April 17, 2010, Dr. Troupe increased the Adderall dosage again. (R. 430). From June 12, 2010, through January 18, 2011, Dr. Troupe, nurses, and therapists, noted a sad mood, bed-wetting, impulsivity, inattention, and oppositional behaviors (R479-502). Despite the Adderall, T.P. continued to have behavioral problems at school. On September 28, 2009, she tried to bite two of her teachers when she did not want to sit for story time. (R. 321). On December 8, 2009, one of T.P.'s teachers detailed T.P.'s oppositional behavior in a letter to her mother, explaining that T.P. would tell her teachers "no" or do the exact opposite when given instructions (R. 326). An October 28, 2009, *Developmental Progress Report* from her school indicated that T.P. "inconsistently" demonstrated social-emotional skills, including playing safely with others, recognizing and responding to others' feelings, and understanding and managing her own feelings. (R. 322).

On August 20, 2010, T.P. was seen by Roxanne Warncke Gaeth, M.Ed., and C. Leslie Cox, Psy.D., due to concerns about the impact her ADHD was having on her educational needs. (R. 472-78). During their examination, T.P. tested the limits of the rules and had to be repeatedly reminded of them. (R. 474). The examiners diagnosed ADHD-combined type and disruptive behavior disorder, not otherwise specified. (R. 478).

On January 18, 2011, Dr. Troupe added Clonidine to T.P.'s medications, as she was irritable with continued ADHD and a conduct disorder. She was also switched to 10mg of Adderall XR. (R. 509). On March 15, 2011, Dr. Troupe noted continued impulsivity with stealing and lying. (R. 511). On May 28, 2011, T.P. exhibited a lot of "attitude," tantrums, and inattentiveness; it was noted she

5

was purposefully doing everything slowly, taking all day to put on her clothes. (R. 514). On July 6, 2011, Dr. Troupe found that Clonidine was causing twitching and switched her to Guanfacine. T.P. was noted to lie, steal, and be cruel to animals. Dr. Troup again diagnosed her with ADHD and conduct disorder (R. 515).

## B.

## The Administrative Hearing Testimony

T.P.'s mother testified that she tries to have T.P. take responsibility for cleaning her room, but she cannot stay on task, so her mother ends up doing it. (R. 76). She has to prompt T.P. to do everything from brushing her teeth to picking out her clothes. (R. 76). T.P. is aggressive at home, going so far as choking her mother when she wants her own way. (R. 77). Ms. Moore couldn't point to any particular triggers that set T.P. off. (R. 77-78). T.P. behaved similarly at school, and had even choked one of her classmates. (R. 78). She had been called to T.P.'s school any number of times to take her home early because she had acted out and would not calm down. This had happened six or seven times in the few months before the hearing. (R. 79).

Ms. Moore reported that T.P. choked their dog and they had to get rid of it. (R. 82). When out in public, T.P. exhibited strange behavior, such as sucking doorknobs. (R. 82). Ms. Moore could not even take her to the grocery store because of her behavior. (R. 83). Although Adderall had initially helped, it was no longer effective. (R. 85). Ms. Moore said T.P. had terrible sleep habits – she was restless, snuck around, whined, hollered, paced, and sleepwalked every night. (R. 87). T.P. would hit her head against the wall when asked to do something, had stolen things from stores, and had been caught lying. (R. 88). She was been kicked out of four daycare centers after putting other children in choke holds, running out of the classroom and going to the bathroom to play with the

6

toilet water, jumping off tables, and putting things in her mouth. (R. 89-90). She could only play with children for a few minutes before wanting to fight or pinch them. That was why she was placed in an "at-risk" kindergarten for special needs children. (R. 90-94). Ms. Moore said she was unable to find babysitters for T.P. because of her aggressiveness. (R. 91-92).

## C.

### The Medical Expert's Testimony

Dr. Milford F. Schwartz appeared and testified as a medical expert ("ME") at the hearing. He allowed that he was not a psychiatrist. (R. 104). He testified that the medically determinable impairments documented in the record are ADHD and ODD. (R. 99, 109). He indicated that the testimony supported a finding that T.P. met listing 112.11, but he felt there was a conflict in the record because the psychiatrist indicated T.P. to be doing well on medication. (R. 100). He said that in June through December 2009, T.P. was doing fine on medication. (R. 100). He testified that in 2008, the records indicated her ADHD was at listing level. (R. 101). He said the state agency noted a diagnosis of conduct disorder – which would be lying, stealing, hurting animals – but he saw no evidence of it in the record. (R. 102). Dr. Schwartz felt there was a "real disconnect" between Ms. Moore's story and the evidence. (R. 103). But at the same time, given her impulsivity, he said "there's considerable credibility to the fact that her medication's not really working . . . a hundred percent." (R. 104). After hearing that T.P. took her medication on the day of the hearing, Dr. Schwartz testified that "[h]er behavior was – she's a very impulse-ridden child . . . also very dramatic." This was typical of a child with ADHD trying to cover her symptoms. (R. 103). He later stated that T.P.'s treatment was reasonably successful, but then qualified that the treatment is less than half optimally successful if Ms. Moore's testimony is to be believed. (R. 110).

7

In the domain of functioning, Dr. Schwartz testified that T.P. had no limitations in acquiring and using information as well as moving about & manipulating objects, and less than marked limitations in attending & completing tasks, interacting & relating to others, and in health & physical well-being. (R. 112-17). Upon cross-examination, pointing out that school records were missing, Dr. Schwartz felt he did not have enough evidence to find a marked limitation in interacting & relating with others. (R120-22). In response to the ALJ's post-hearing interrogatories, Dr. Schwartz affirmed his opinion regarding T.P.'s functional limitations. (R. 503-05).

## III.

## THE ALJ'S DECISION

The ALJ stated that T.P. was currently a preschooler who suffered from the severe impairments of attention deficit disorder (ADHD) and disruptive behavior disorder. (R. 22). The ALJ concluded that T.P.'s impairments did not meet or equal the requirements of any listed impairment – specifically, listings 112.11and 112.04 – because she did not exhibit a marked impairment in two areas of functioning. (R. 23). Similarly, the ALJ determined that T.P.'s impairments did not functionally equal the listings because she did not have a marked limitation in two areas of functioning or an extreme limitation in one area of functioning. (R. 33-42). Instead, the ALJ found that she had no limitation in acquiring and using information, less than a marked limitation in attending and completing tasks, less than a marked limitation in interacting with others, no limitation in moving about and manipulating objects, a marked limitation in caring for herself, and less than a marked limitation in health and physical well-being. (R. 33-42). The ALJ also found the statements of Ms. Moore and her daughter were not entirely credible because the objective evidence did not support the extent of their allegations, and T.P. was not receiving the type of

treatment one would expect for a totally disabled child. Moreover, when T.P. took her medication, her symptoms were much less severe. And, there was no evidence that T.P. was receiving any more help in performing activities than would a normal child of her age. (R. 32). The ALJ adopted the opinion of the medical expert and found T.P. was not disabled and not entitled to benefits under the Act. (R. 33, 42-43).

## IV.

## DISCUSSION

### A.

### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence is not persuasive. *Berger*, 516 F.3d at 544.

**B.**

**Sequential Analysis**

A child is disabled under the Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486-87 (7th Cir.2007). At the outset, if the child is engaging in substantial gainful activity, the claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Next, if she does not have a medically severe impairment or combination of impairments, the claim will be denied. *Murphy*, 496 F.3d at 633;

*Giles,* 483 F.3d at 486. Finally, the child's claim will be denied unless her impairment meets, or is medically or functionally equivalent to, one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486-87.

The determination of functional equivalency involves a further analysis of the child's condition in the context of six "domains" or categories, from an age-appropriate standpoint: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for oneself, and 6) health and physical well-being. 20 C.F.R. § 416.926a(a), (b)(1); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A child's impairment is functionally equivalent to the listings, meaning the child qualifies for benefits, if the ALJ finds she has marked difficulty in two domains of functioning or an extreme limitation in one. 20 C.F.R. § 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487.

A marked limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(I); *Giles*, 483 F.3d at 487. It is further defined as "more than moderate, but less than extreme," and can be demonstrated by standardized test "scores that are at least two, but less than three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(I). An extreme limitation is present where the results of a standardized test are three or more standard deviations below the norm for the test, or when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(3).

## C.

Ms. Moore takes issue with the ALJ's decision on several points. She is confused by the fact that, while the ALJ found that T.P. was markedly limited in her ability to care for herself, those

deficiencies did not translate into a marked limitation in any other domain. She submits that the ALJ failed to take into account the fact that T.P. received a great deal of assistance to get along every day. She also criticizes the ALJ for relying on different evidence to assess T.P.'s functioning in different domains. Finally, Ms. Moore argues that the ALJ's credibility determination was flawed.

Ms. Moore has a point about the ALJ's analysis of T.P.'s functioning across domains. The Commissioner's regulations recognize that "[a]ny given impairment may have effects in more than one domain; therefore, we will evaluate the limitations from your impairment(s) in any affected domain(s)." 20 C.F.R. § 416.926a(c). Social Security Regulation 9-7p provides an example of how a limitation in the area of caring for oneself – the relevant limitation here – can affect functioning in other domains:

> a boy with Oppositional Defiant Disorder who refuses to obey a parent's instruction not to run on a slippery surface endangers himself and disrespects the parent's authority. In this case, the child's mental disorder is causing limitations in the domains of "Caring for yourself" and "Interacting and relating with others." . . . Rating the limitations caused by a child's impairment(s) in each and every domain that is affected is not "double-weighting" of either the impairment(s) or its effects. Rather, it recognizes the particular effects of the child's impairment(s) in all domains involved in the child's limited activities

SSR 9-7p, 2009 WL 396029, *4.

Here, the ALJ determined that T.P. had a marked limitation in the ability to care for herself. In so doing, the ALJ relied on records from T.P.'s preschool and Ms. Moore's testimony to arrive at this conclusion:

> She put things in her mouth (play dough, names [sic] tags) which were major choking concerns. The claimant required one-on-one attention for her safety and the safety of others. She threw water all over the floor in the classroom, climbed up on tables, went out of the classroom on her own. Ate soap and toothpaste, and jumped on her friends. She would sometimes have to be restrained. The claimant was offered

12

> rewards for good behavior redirected to other activities. The IEP conference report of August 2008 also indicated there were behavioral concerns that affected the claimant's safety. She showed aggression and could be non-compliant. She had a short attention span, climbed on and jumped off furniture. She was disruptive and physically aggressive. As described above the records repeatedly note that was generally more hyperactive and less controlled when she did not take her medications.

(R. 41)(parenthesis in original). By definition, then, the ALJ determined that T.P.'s various behaviors – like physical aggression to the point where she had to be restrained – were at a level that "interferes seriously with the child's ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(I); *Giles*, 483 F.3d at 487. This raises at least a couple of questions.

One, if T.P. was throwing water on floors, jumping off furniture, running out of class, requiring redirection and one-on-one supervision to the point where it seriously interfered with her ability to take care of herself, it would seem that it would have a similarly detrimental effect on her ability to complete tasks. The portrait the ALJ paints in the "taking care of oneself" portion of her opinion is in stark contrast to the ALJ's conclusion in the "attending and completing tasks" portion of her opinion. There, she determined that T.P. had a less than marked limitation in her ability to focus, maintain attention, and carry out and complete tasks. (R. 35). It strains logic that a child who requires one-on-one supervision or is prone to leaving class or requires restraint is a child who can focus and complete tasks. That type of reasoning cannot be followed. *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

Two, and along similar lines, it is difficult to understand how a child who is so aggressive with others – both classmates and teachers – that she must be restrained can be said, on the one hand, to be markedly limited in her ability to care for herself but, on the other hand, have no serious limitation in her ability to interact with and relate to others. But, that is what the ALJ determined.

(R. 38). And, again, the reasoning strains logic and cannot be followed. *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004)

It would appear that the ALJ dismissed T.P.'s significant problems in the areas of attending and completing tasks and interacting with and relating to others because her medication corrected whatever problems she may have had in these areas. (R. 36-37, 38-39). Yet, while the ALJ acknowledged T.J.'s medication regimen in her discussion of her ability to care for herself, she did not find it corrected such problems as physical aggression with others, running out of class, jumping off furniture, etc. (R. 41). The ALJ still found that, despite medication, T.P. was markedly limited. But the problems markedly limiting T.P. in the domain of caring for oneself would have as detrimental an affect on her functioning in the domains of attending to tasks and interacting with others. So, medication cannot be the trump card the Commissioner seems to argue it is. (*Defendant's Response*, at 9).

The ALJ's failure to build a logical bridge between the evidence and her conclusion, of course, requires a remand in this case. But it is worth mentioning some other problems with the ALJ's opinion that ought to be addressed on remand as well. For one, the ALJ seemed to gloss over the degree of support T.P. required even to function at the level she was. Under SSR 09-1p:

> we consider the kinds of help or support the child needs in order to function. See 20 CFR 416.924a(b). In general, if a child needs a person, medication, treatment, device, or structured, supportive setting to make his functioning possible or to improve the functioning, the child will not be as independent as same-age peers who do not have impairments. Such a child will have a limitation, even if he is functioning well with the help or support.

2009 WL 396031 at *9; *see also* 20 CFR 416.924a(b)(3)(I). In this case, T.P. was "on several different modalities of treatment" (R. 111), and attended a special needs school where classes are

limited to ten students and each has a teacher and two program assistants. (R. 507). This was certainly a case where the child needed "a person, medication, treatment . . . or structured supportive setting to make [her] functioning possible or to improve the functioning . . . such a child will have a limitation, even if [s]he is functioning well with the help or support." 2009 WL 396031 at *9. While the ALJ mentioned T.P.'s mediation regimen, she did not mention it in terms of a crutch T.P. needed to allow her to function, and she did not mention at all the supportive environment she was in every day. Indeed, the ALJ curiously stated that there was no evidence that T.P. needed any more help performing activities than would an unimpaired child of her age. (R. 32).

For another, in her credibility assessment, the ALJ states that T.P. "has not received the type of medical treatment one would expect for a totally disabled individual" and wasn't receiving any significant degree of help. (R. 32). Again, the evidence shows that T.P. is receiving a significant degree of help well beyond what would be necessary to allow an unimpaired child to function. As for treatment, it is left to speculation what more beyond medications, therapy, and visits to a psychiatrist would be expected for a girl with ADHD and ODD.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for remand [Dkt. #20] is GRANTED, and the defendant's motion for an affirmance of the ALJ's decision is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/14/14